This case was the last filed. I don't know if it was the last filed in the country, but I know it was the last filed in the circuit. It's the last one here, but the laws that are at issue are materially the same, and the 14th Amendment challenges to those laws are identical. The question is, does the 14th Amendment prohibit the state from defining marriage as between a man and a woman? The state's answer is no, and thinks that there's three reasons that the preliminary injunction issued by the district court should be reversed. First, this is a matter that's foreclosed by binding precedent. Second, the laws at issue satisfy rational basis review. And third, that there's no valid grounds for applying anything other than rational basis review. The binding precedent issue is a matter of court hierarchy, orderly rules of decision, or I believe it was said in an earlier argument, like a process analysis. But the Supreme Court's summary dismissal in 1972 in Baker v. Nelson arose from a Minnesota Supreme Court case that rejected equal protection and due process challenges to a state law dealing with same-sex marriage. Back in those days, the Supreme Court had to take those kind of cases from state Supreme Courts under the Section 1257. There was an automatic right of appeal, so it had to make a decision. The U.S. Supreme Court dismissed the appeal for want of substantial federal question. And it's well established that summary dismissals prevent lower courts from reaching different conclusions than the Supreme Court, and that summary dismissals have full precedential effect. Something that's important about it is that it's distinct from an issue of stare decisis. The effect of Baker v. Nelson on— Counsel, let's get right to the exception, because I think we understand what the rule is with regard to summary dismissals, but there's this exception that talks about when doctrinal developments are subsequent to this summary dismissal, then the inferior courts can look to doctrinal developments in determining how that summary dismissal should be applied. Isn't that right? Well, there's two points about doctrinal developments that are pointed, Your Honor. The first is that the Supreme Court has said that when there's a directly applicable precedent, lower courts must follow it and leave it to the Supreme Court to overrule its own decisions. And that's the Rodriguez v. Cuias, Agostini v. Felton rule that's cited in our brief. The other thing about doctrinal developments is that even if that wasn't the rule, the problem here is that the doctrinal developments argument that's put forth doesn't work. When you look at what are the doctrinal developments, the other side argues, well, you look at Romer from 1996. Well, we know Romer was not directly on point. It was dealing with a Colorado law that was of unqualified breadth, and it's not directly on point. The next doctrinal development would be Lawrence. That also dealt with the issue of gay rights. The problem there is not only is it not on point, there's an express disclaimer in there where the court said, this case does not deal with issues of whether or not homosexual persons have to have the right to state recognition of any union. What about Zablocki v. Redhill? The court said that marriage is a fundamental right. Well, Your Honor, the Zablocki case along with the Turner case that was being talked about earlier, I think that the most important point about all of the general fundamental right to marry cases – I'm just talking about in the context of a Baker summary affirmance by – I think the key there is that in Zablocki when they're talking about the fundamental right to marry, they're talking about it in procreative terms and, more importantly, in terms of the way that the term right to marry and marriage was understood at the time that the court made the decision. There's something – and the reason why I know this is the case, specifically in the Zablocki case, what you have is you have an opinion by – I believe it was Justice Marshall wrote the majority opinion and then you had several concurring opinions. In one of those concurring opinions, Justice Powell went through and disagreed with the analysis that you can just look to a general fundamental right to marry. The reason he disagreed with it because he realized even back then that if you use that line of analysis, then it's going to lead to a fundamental right to marry with no limits. And we know that that's not the case because there are limits that the state can place on marriage. And the point being in Justice Powell's concurring opinion, he specifically went through and just like we see in the opinions today when they talk about the things that may be affected by finding a general fundamental and unlimited right to marry, such as being able to put limits on polygamy, age restrictions, and so on and so forth, Justice Powell recognized those things and specifically listed homosexuality on those lists. Two years after Hick's formulation, the court gave us some guidance about Becker and substantially changed it whether it's adequate is a different question. But the language of the court here was that it does not prevent lower courts from coming to opposite conclusions on the precise – it does prevent lower courts from coming to the opposite conclusion on the precise issues developed. And you look to the jurisdictional statement and then you look at all the facts of the case, the factual differences, et cetera. So it opens up, wise or unwise, to the lower courts the task of an obligation to say, is this different, has it changed, have there been sufficient doctrinal changes? It's a very opaque directive to the lower courts. Well, Your Honor, I think the case that you were talking about after Hick's in the 70s. Two years later, 77. That's right, Your Honor. And the Rodriguez de Quilloz case and Agostini v. Felton both were in, I think, in the 90s, late 80s, 90s. We're well aware of Rodriguez because it reversed this court. I think that the point – and this is a very good point because – and this is something about Baker v. Nelson that often I've seen get overlooked in some of these opinions. Prior to the Windsor case, there have been courts that have looked at the issue and said Baker v. Nelson doesn't bind us. Most of the courts looking at these issues say they do, but when they have looked at Baker v. Nelson and said they didn't bind us, and my example would be like the Massachusetts v. Health and Human Services case out of the First Circuit in 2012 that was looking at DOMA, they were able to distinguish the questions in the jurisdictional statement. That's not a problem here. Baker v. Nelson definitely raised the issues that are raised here in this case, an equal protection and due process claim. So that route of getting around Baker by saying that the case doesn't really directly involve the issues like they did in the Massachusetts case or, as I would submit, like in Windsor, that was Blagg's problem with their Baker v. Nelson argument. It's the reason that the question from Baker v. Nelson wasn't part of the Windsor case and it wasn't included in the Windsor opinion. By now, this all may be moot. That's right, Your Honor. I don't know what time they meet, but it may be. But the important point there is you're making a correct observation, which is that Baker v. Nelson was specifically briefed in Windsor and was not mentioned, right? That's correct, Your Honor. Which would indicate that Windsor addressed a different question so that none of the justices needed to mention Baker even though it had been briefed. I would absolutely agree with that, Your Honor, and I think you can see some others as well. The issue of whether or not sexual orientation should be recognized as a suspect class was extensively briefed in the case. Justice Ginsburg said there's been a sea change in the whole area, this whole area of human rights and equal protection in particular since 1975. Your Honor, Justice Ginsburg said that. I think that that's part of the problem. So the absence of any mention of it in the opinion could just be a suggestion that the Supreme Court gave such short shrift to it they didn't even deem it worthy of talking about it. Isn't that a reasonable conclusion to draw from its absence in the opinion? I don't agree with that, Your Honor. I think the reason that they didn't address it was because it had no application to the particular case there. It happens to neatly span my years on the federal bench. It's kind of hard for me to say there hadn't been a sea change. Well, Your Honor, I think that to say that there has just been developments in case law under the 14th Amendment, yes. The problem is that I'll move on, Your Honor. Thank you. I would just cap it off with saying Baker's not overruled by name or by outcome, and so it's binding on lower courts, lower federal courts and state courts. My second point, the Mississippi laws and the issue here is whether or not they satisfy rational basis review. The rational basis review asks a simple question, does the law bear a rational relation to a legitimate government purpose? The characteristics of rational basis review are extreme judicial deference. Judges don't substitute their policy judgments for those of legislators, and what you're looking for is there any conceivable rationale for legislative choices. The legitimate government interest here is in an area dedicated to the states, which is domestic relations and marriage specifically, but promoting stable family relationships, those who procreate naturally. The government regulates sex because men and women may or may not intentionally create children, but when they do, the government has an interest in the relationship that a relationship is formed when they create a child that the parents provide for the child. One way to address it is to ensure that men and women who get married or remain married, and a way to do that is incentivizing the men and women to do that through subsidies and benefits. It's not an incentive to have sex, but it's an encouragement for the men and women to maintain, create and maintain a stable family relationship. The attacks, and some were discussed earlier about problems with it and the over-inclusiveness. You don't need any incentives for them to have sex, do you, Gene? You're not going to disagree with that, are you? No, I think that most people would agree with that. They do have an incentive on making sure, though, that when people do have sex and when it creates children, there we have it. On cue. That child needs a stable family relationship. And it's one, I would say this, and this is the most important thing about it, however we want to call it, whether it's the responsible procreation argument or channeling procreation or what have you. It's the way, it's what the traditional marriage was formed around. It was the legitimate interest behind it in the first place, and it's still a legitimate interest today. It might not be the only or the best means, but it is a permissible means when you're applying rational basis review, when you're looking at cases like Heller where we're talking about an ends-means fit and lack of imperfection, cases that are cited in our brief where there's arguments, policy arguments that evidence that the law doesn't do enough or it does too much, it doesn't prove that a law can't pass rational basis, it doesn't prove that there's no rational basis for the law. The best means to accomplish the purpose is not required. One problem with approaching it with an under-inclusive, over-inclusive argument is that it's true that older persons and true that there are people that are infertile, people that choose not to have kids, those persons are allowed to get married. But the problem is you can't draw the line at just fertility. If you draw the line at just fertility, you're getting into issues like the privacy of the couple and interfering with their ability and their privacy rights under the law. Where inclusion wouldn't serve the interest of channeling the procreative – channeling into the procreative relationships, when excluding one group and not including another wouldn't serve the interest as well, it again points to that there's not a good – they may not be the best fit, but it doesn't mean that there's no fit at all. The other rational basis and the other issues, and this came up a lot in the case, Louisiana case prior, but they get tagged with various labels when we're talking about political process, rationale, or caution and wait and see. And the subject of federalism in Windsor comes up in the discussion. A key feature of the federalist system is the social policy that states are allowed to set in domestic relations. It's something that Windsor confirmed, and I think of all the back and forth earlier about Windsor and Windsor wasn't decided on federalism, I think that it boiled down to and what was the most important point was if New York hadn't decided, if New York hadn't made the choice to change their definition of marriage, then you wouldn't have had Windsor at all. It was because of the state's ability to choose that created the conflict with DOMA, and Windsor clearly didn't say that New York has a right to choose to change their definition, but nobody else has a right to stick with their original definition. I think these things go to the essence of whether you want to call it wait and see, rationale, or caution, but states are allowed to let other states change the way that they do things, sit back and watch and wait and see, and make their own judgments and legislate incrementally, particularly in areas that are dedicated to them exclusively, like the domestic relations realm. My third point, Your Honor, was that no higher form of scrutiny than rational basis for review should be applied here. The district court below purported to analyze the laws under rational basis . . . What was the level of scrutiny applied in Windsor? The level of scrutiny applied in Windsor was rational basis for review, Your Honor. I think . . . Is that your interpretation of Windsor, or is that what the court said in Windsor? That's what I believe that the court said, so it is my interpretation, but I think that . . . I guess I'm recalling careful consideration, careful review, something like that. Here's where I think careful consideration fits in. I think when you're talking about careful consideration and when you're talking about Windsor, you're actually looking at can we use what's developed as the animus doctrine that's discussed in our briefs in order to look for clues for animus that might justify careful consideration or something more than rational basis for review. In Windsor, the court was able to look at the structure of the law. What does it do? It's an unusual deviation from the norm for Congress to be legislating in an area that is traditionally an area for the states. You look at the structure of it, and then they had legislative history in the title and the things that they looked at, and it was that unusual deviation of DOMA in Windsor. So in your view, the level of scrutiny applied in Windsor was no more searching than just a rational basis review. That's your reading of Windsor. Well, I think it's an animus rational basis review. The court was able to found and described it as. Rational basis plus or something. It wasn't described as rational basis plus in the opinion. I think we're talking about careful consideration. So, Your Honor, I believe it's something different, but the important point is how did they get to that? And the way that they've gotten to that, and I think another case like that would be Romer itself, where it's rational basis review, but they're looking at the unprecedented and unqualified disability, the breadth of the law that Colorado had passed back in the 90s, and they're looking to whether or not it could be explained by anything but animus. When they were able and satisfied that there couldn't be anything but animus because the structure indicated that the scope and the breadth of it was so overbroad, and then the rational reasons offered by the state were rejected, then that's why you had the laws fail in both those cases. So they both failed rational basis review, but it's the analysis of how the courts got to it that was different. The court below didn't conduct that analysis. Judge Reeves, he just looked at it and overlaid Windsor on top of the Mississippi law and said you can look at Windsor and exactly what it did and look at the Mississippi laws and say that they're exactly the same, but we know that that trigger and that structure that triggered the animus is missing because when the Mississippi legislature enacted the statute that's at issue here and when the people of Mississippi voted on the constitutional provision, they were not acting beyond their sovereign lawmaking authority someplace that they didn't belong. They weren't making rules about something that they didn't have any business making rules about. States have been making the rules about marriage like this since the beginning of our country, and so I think that that's what distinguishes Windsor when you're approaching Windsor as an animus case. That's what distinguishes Windsor and distinguishes DOMA from the constitutional provision and the laws that are at issue here. The other two reasons in addition to the distinctions and the lack of application of the animus doctrine here, one was mentioned earlier in the context of whether or not sexual orientation can be recognized as a suspect class or a quasi-suspect class. The state's position on that is that that's foreclosed as a matter of the panel opinion, and also, as we had stated in our brief, Judge Reeves agreed with that and recognized that he was bound by the Johnson panel opinion. Meanwhile, the tension between applying a level of scrutiny of exceedingly persuasive and, Hogan, to use another Mississippi story, you're admitting a male to a school of nursing. That's O'Connor's opinion dealing there with discrimination with sex as a classifier gender and moved it up to an exceedingly persuasive and intermediate level of scrutiny, and here we have sexual orientation, which would be a rational basis. Do you see any tension in those principles? I don't, Your Honor. I think, I mean, the obvious distinction is that gender is recognized as a quasi-suspect class and that that changes the scrutiny. Well, of course. It's recognized because the court said that, and I'm just saying it said that, but then you also say that we're looking at the marriage here. You're looking at the orientation, the sexual orientation. My question to you is do you see any tension in those fundamental principles of the level of scrutiny that government ought to give to the state's use of those as classifiers? When you say you see any tension, I think in this— Exceedingly persuasive was the language, I think, of the court. Well, I think what had—and this had come up as an issue in the district court below— if you say that there's four rough factors you're looking at when you're talking about a suspect class or whether designated as a quasi-suspect class, some of— It's not a suspect class. Justice Ginsburg came close to getting the fifth vote for that, but she didn't get it. And so it's not a suspect class. But Justice O'Connor's opinion moved that up from a rational basis test to what we generally regard and treat as the intermediate level of scrutiny. Exceedingly persuasive. I'm just trying to—Guy, I just wanted your view of whether there's tension in those principles. Well, I think that the—and I guess what I'm understanding is we're talking about a quasi-suspect class? Well, that's another label for heightened scrutiny, I suppose. Right. Well, and I guess that the point here is— That's what Justice—Judge Goldberg of our court called it in another case, but it was avert. But in Cleburne, the court never really quite articulated that. But plainly, most people regard Cleburne as having applied some form of heightened scrutiny because it was dealing with retardation, retarded people, which was an immutable characteristic as a classifier, albeit one that was relevant to regulatory reach because of the very nature of it. Unlike the question here of sexual orientation. Your Honor, if I may respond. I think that that's one reason that Cleburne is often folded into this idea of it being part of the court's animus doctrine cases. When you're looking at can you say that the law is justified by anything but animus and rule out the rational basis for them, then the law is no good. Thank you, Mr. Matheny. You've saved time for rebuttal. Ms. Kaplan. Good morning, Your Honors. May it please the Court. I am delighted to be down here in New Orleans. I apologize for bringing our cold weather with us. And it's an honor to be arguing this case in the John Minor Wisdom Courthouse. Because of the Mississippi statute and constitutional amendment at issue in this case, many thousands of gay people in Mississippi are being treated as second-class citizens. Marriage obviously affects practically every sphere of day-to-day life, from death and taxes to children and benefits to status and dignity. As Justice Kennedy explained in Windsor, one of the main problems with DOMA was that it humiliated tens of thousands of children now being raised by same-sex couples. The exact same thing is true here. But you don't have to take my word for it. My clients, Josie and Carla's then four-year-old daughter, Grace, begged her mothers to get married so that they would be like other families. The Supreme Court made it clear in Windsor that gay people have dignity under the law that is equal to the dignity of everyone else. And I'm going to correct, if Your Honor doesn't mind, my brother from Louisiana. The dignity at issue in Windsor did not come from the political process in the state of New York. Edie Windsor was married in Toronto, Canada in 2007. Her spouse, Thea Speyer, died in 2009. The New York legislature went through the political process that my brother talked about and passed the bill in 2011. Once you accept the fact that gay people have equal dignity, then any purported justification for the government to treat them differently in marriage is unconstitutional, no matter what level of scrutiny applies. Even in the lowest form of rational basis review, as Your Honors have already talked about today, a court must ask whether the classification bears a rational relation to a constitutionally permissible objective. In the St. Joseph Abbey case decided in 2013, this court explained that it will insist that the basis be rational. In other words, the court's analysis, and I'm quoting from that case, does not demand judicial blindness to the history of a challenge rule, nor the context of its adoption, nor does it require courts to accept nonsensical explanations. For this reason, a hypothetical rationale, even post-hoc, cannot be fantasy. Here, given that Mississippi does not, one, limit marriages to fertile people, two, prohibit adoption, three, penalize married couples with children who divorce, and four, actually concedes that gay people are just as capable parents as straight people, then the state's principal rationale for excluding gay people from marriage to somehow channel responsible procreation is irrelevant, irrational, and too much of a disconnect to pass constitutional muster. And I'll note two other things. The statute here is not economic regulation. We're not talking about the kind of economic regulation at issue in footnote four of Caroline Products. This is the other kind of law, the kind of law that goes to issues of personal liberty and personal dignity. Moreover, the casket law at issue in the St. Joseph Abbey case was not directed when it was passed at the monks per se. Here, there can be no question whatsoever that the laws at issue here were directed specifically at gay people, at excluding them from the benefits and protections that other people have,  But you're arguing animus. You're arguing animus. I believe there's animus, Your Honor. I believe that you don't have to find animus. I think it fails rational basis, but I believe there's animus. You're arguing essentially that animus is a correlative of irrationality. I think one of the factors that shows animus is irrationality, if the reasons, as the court has said, make no sense, they're so disconnected, then that's evidence of rationality. Let me go more into animus. First of all, I want to be clear about this, because I think there's been some misconception. It is not necessary to demonstrate overt hatred in order to show constitutionally impermissible animus. I think part of the problem here is the word animus has created in people's heads that there has to be some kind of bigotry or hatred. That is not necessary. In Romer and Windsor, the Supreme Court found such an impermissible animus to be present without finding that either the citizens of Colorado who voted for Amendment 2 in Romer or the members of Congress who voted for DOMA were bigoted. Indeed, the court in Windsor made no attempt to track the vote of everyone who voted for DOMA. In Windsor, it was enough for the court that, one, as my co-counsel said, that DOMA was called the Defense of Marriage Act. What was it defending against? Two, that it imposed broad and undifferentiated liabilities on a class of people. Same thing here. And three, that one line in the legislative history, one line, cited moral disapproval of gay people. Here, the chair of Mississippi's Senate Judiciary Committee stated that the passage of Mississippi's 1997 law was more symbolism than substance. If the law was more symbolism than substance, then what was the symbol being expressed other than a moral disapproval of gay people? Now, what I'd like to do, Your Honors, is turn to the rationales that Mississippi has offered. There are really only two. One is procreation that we've been talking about, and two is some combination of caution, wait and see, federalism. I want to start with procreation. In its reply brief, Mississippi advances one argument for why it's okay to discriminate against gay people in marriage, and I'm going to read directly from their brief. What they say is that Mississippi's laws are structured to incentivize responsible procreative behavior by opposite-sex couples, an interest not implicated by non-procreative same-sex relationships. Now, going back to the rational basis test, I'm going to start at the bottom, there has to be both a constitutionally permissible objective and a connection between that objective and the means that were chosen to achieve it. Now, when it comes to procreation, we can all agree that promoting children, the best interests of children and the wealth of their families, is a legitimate governmental objective. That's, in fact, a large reason why my clients brought this case in the first place. But the problem with the procreative rationale has to do with the absence of any rational connection between that objective and what these laws actually do, which is to exclude gay families from marriage, just as the St. Joseph Abbey regulation prevented monks from selling wooden coffins. Now, while marriage obviously does have something to do with raising children, the state's essential argument is all that really matters is somehow the act of procreation and its immediate aftermath. What the state also cares about, however, is not only how children come into this world, but what happens to them once they get here. On this point, Mississippi actually has the highest percentage of gay families with children in the nation, 29%. I'd refer you to the Williams Institute amicus brief. But the state has offered not a single reason why those children should be treated worse than the children of straight parents. It certainly isn't their fault that their parents happen to be gay. And just like children who are adopted, there is no possible explanation that passes any test of logic, common sense, or even simple human decency for why the state should not want those children to have the same benefits and opportunities that other children do. Moreover, there is no rational reason to believe that the exclusion of gay couples from marriage somehow incentivizes straight couples to do anything at all. In the words of St. Joseph Abbey, it is fantasy to assume that any young woman who accidentally gets pregnant will decide to marry the father of her child because my clients cannot. Mississippi's post hoc justification is also nonsensical because it hypothesizes that the only reason why the state issues marriage to straight couples is to somehow channel procreation. And I understand what my brother had to say about fertility, but if the real reason or the sole reason for marriage is procreation, first of all, there's not a word about this in the legislative history for these statutes, and there was plenty of talk at the time about preserving traditional marriage. And two, if procreative behavior is the only reason, then men and women would not be permitted to marry for the first time or remarry over the age of 55. Well, that only means that it's an imperfect fit that, in the words, Supreme Court's words in Heller, leads to some inequality. Yeah, I believe it's not the fact that it's an imperfect fit, Your Honor. I believe there's no connection, there's no fit. In the Heller case, the court was talking about the difference between mentally retarded people on the one hand and mentally ill people on the other. And the court said that there was a significant enough difference in the treatment, which obviously there is, of mentally retarded people and mentally ill people to justify the differences in the commitment standards. Here, no one, no one is offering any difference between gay couples on the one hand and straight couples on the other that could possibly justify it. We're not talking about a distinction in commitment procedures. We're talking about exclusion that affects every single sphere of everyday life, that affects, as Justice Kennedy said, the essential dignity of citizens. So I don't think any of the cases cited on a rational basis support their view, certainly not the ones for economic regulation and certainly not Heller. The law is also nonsensical in the sense that Mississippi laws do nothing, really, to encourage that married couples with children actually stay married. If Mississippi wanted to give tax credits or cash bonuses to married couples with children who stay together until the kids grow up, that would be a different case. And there are certainly no specific penalties or limits in Mississippi in connection with divorce. Finally, the state here, and it's very important in the Mississippi case, concedes that it's undeniable, that's their word, that gay couples are just as capable as parents. Given that, there can be no kind of post hoc rationale that Mississippi's marriage ban is okay because it dissuades gay people from having kids. And even if that were true, and there's absolutely no record in that regard and certainly no evidence in that regard, such a rationale would be totally irrational. I'm going to turn, if I may, Your Honors, to the caution rationales. Here... On the procreation question, as I'm sure you know, the Minnesota Supreme Court in the Baker case discussed that and said, nonetheless, it didn't lead to any kind of violation of the Constitution, the fact that the procreation rationale wasn't perfect. You're talking about Baker v. Nelson, Your Honor. Baker v. Nelson. I believe, for all the reasons I've said, that the procreation rationale doesn't work here. The world was a very different place in 1972 when Baker was decided. There were, as I heard Judge Higginbottom refer to, there was certainly been a sea change, not only in the law, but in the way gay people live in our society. In 1972, gay people had to live their lives in the closet for the most part. If they wanted to keep a job or be civil to their neighbors, most gay people lived in the closet. We have a very different world today where there are gay people like my clients living openly with their children. And given that situation, the reality of everyday life that Justice Holmes talked about in his book on the common law, that the life of the law is experienced, the relative factor here is there's no, in today's world, no rational reason for treating those couples differently and certainly nothing having to do with procreation. Now, the problem with the caution rationale is different. Why do you suppose, though, that in light of the specific reasoning and holding in Baker, the Supreme Court said no substantial question, move along, there's no problem here, nothing to see here? Why did they say that in 1972? Because times can bind, Your Honor. In 1972, the world was okay, it was criminal to be gay in most states in this country. But the Equal Protection Clause was there and the point was made about procreation and that point was specifically examined by nine justices who saw, none of whom saw a substantial federal question regarding the procreation rationale and the fact that it was an imperfect fit. As the Minnesota Supreme Court said, absolute symmetry is not demanded by the 14th Amendment. That's specifically what's at issue here. You're right, Your Honor, that absolute symmetry is not required by the 14th Amendment. But in a world in 1972 where gay people not only could not be in an open couple and have children, but in most states they couldn't be even open without facing the threat of prison, that kind of rationale makes a hell of a lot more sense. Excuse my colloquial language. And there's a lot more of a connection than there would be in today's world. Justice Kennedy, no one could have expressed this better than Justice Kennedy has. He was right when he said that times can bind. Times have blinded this country about African Americans, times have blinded this country about women, and times have blinded this country about gay people. But fortunately people have come to realize that their gay neighbors and brothers and family members are no different than anyone else. What do you think it is in Windsor, and of course I know you're intimately familiar with Windsor because you've tried that case, argued that case. I've heard of the case, Your Honor, yes. And congratulations to you for your good work there. Thank you. But why do you suppose the Supreme Court in Windsor was so careful in the penultimate sentence of the majority opinion to say this opinion and its holding are confined to those lawful marriages, meaning the marriages that the federal government had tried to define or constrict? I think they were so careful, firstly, because that was the only issue we raised in the case. I can say this as counsel in the case. We were very careful not to ask the court to decide any broader issue. The question in Windsor was specifically only with respect to couples who were already married. And the court properly, as we want courts to do, only decided the question before it. Moreover, a case with the broader question, the Perry case in California, was argued the day before. So they were well aware of that other issue, and they were also well aware that it wasn't the issue in Windsor. One of the things that I notice here, and first of all, correct me if you think I'm wrong, but I find it unusual for the Supreme Court to put this specific limitation at the end of one of its opinions. In fairness to you, they did the same thing in Stern v. Marshall, which was a bankruptcy case two or three years ago. But they don't often— Believe it or not, I've actually litigated Stern v. Marshall, Your Honor. You did? All right. In my spare time, I do commercial law, so I know. Oh, okay, so you'll be listening carefully next Wednesday to the case that's going to be argued. I will. Very good. But they very rarely do this, but I noticed that the statement that the court made was not only that its holding was confined, but this opinion and its holding are confined, which tells me that the reasoning the court used was limited to the question immediately at hand, not just the holding but the reasoning. I believe that the holding—let me back up. I think they were well aware, given the Perry v. Windsor juxtaposition, that this other issue was out there. As Your Honors are aware, they did not reach the merits in Perry, and they knew that they were going to get this case again. They will get this case again. We heard a joke from Judge Higginbottom about the fact that they're deciding that very issue perhaps this morning. So I think they were, as courts should be, very careful only to decide— They were responsive to Justice Scalia, who saw that reasoning in quite different—in very strong terms. Exactly. I don't often find myself in this context— I think it's a very good question. Yeah. I don't often find myself agreeing with Justice Scalia in this issue, in this area. But here I have to say I agree with him completely. While the holding of Windsor clearly does not apply to the right of couples to marry under state law under the 14th Amendment, the logic of Windsor does. Because the logic of Windsor, as I started out with, says that gay people have a dignity that's equal to everyone else. And once you accept that gay people are equal to everyone else, then all these reasons really make no sense. That's why you're seeing this huge almost uniformity other than the Puerto Rico case, Judge Feldman's decision, and Judge Sutton's decision. You're finding an enormous groundswell in the federal courts. Not because it's a popularity contest, but because when you look at the logic and language of Windsor, it's hard to imagine treating gay people in such a discriminatory manner if you accept the fact that they're the same as everyone else. Now, the problem with the caution argument is different than the problem with procreation. Procreation, as I said, is a legitimate rationale. The problem is the fit. In caution, the problem is that the rationale itself is illegitimate. The argument is essentially tautological in the sense that the objective and the means for achieving it are one and the same. In other words, the argument is because the government values caution, we should be cautious about allowing gay people to be treated equally in marriage. That doesn't really make any sense. Moreover, any such kind of go-slow argument also doesn't work because it's counterfactual. I thought you had written something to the effect that you understood and appreciated Justice Ginsburg's statements that the court should sort of maybe wait either for a split in the circuits or should wait to let the matter percolate for a while. I mean, I thought you were approving of her view on that. I think with respect to the Supreme Court, which has completely certiorari jurisdiction in terms of these issues, Your Honor, her decision and the court's decision before there was a circuit split, which is typically when the Supreme Court takes cases, to allow the cases to decide the case made perfect sense. I think that, unfortunately, for Your Honors, that's a different issue. You do not have certiorari jurisdiction. You are bound to decide cases alleging discriminatory state law under the 14th Amendment. This court, I don't have to tell you, has a proud tradition in that regard. So I don't think that go-slow argument works for this court, and I don't even think Justice Ginsburg was doing that. I think, as she said at the time, she was saying that the Supreme Court should do what it normally does and wait for there to be a circuit split. Now, the court in the St. Joseph case made it clear that the courts don't have to be blind to the context or history of the challenged rule. And here, there is no evidence whatsoever that Mississippi was trying to be cautious. There were no hearings on the impact of same-sex marriage. There was no testimony. There were no studies. And, in fact, we know the answer to the question, I think posed by my brother from Louisiana, about the supposed impact of marriage for gay people. Gay people have been marrying in Massachusetts for ten years, and there has been no decrease in the rates of straight people getting married and no increase in divorce. I don't know how long, to respond to Judge Sutton's opinion in the Sixth Circuit, I don't know why ten years isn't enough. It doesn't seem to me that people have to wait for their rights 50 years or 100 years. It seems to me that the record in Massachusetts is pretty strong. Moreover, by enshrining the discrimination here in a constitutional amendment, the state of Mississippi was being anything but cautious. It was requiring the voters to go through the amendment process again to give gay people their rights. That's not going slow. That's a hard stop. With respect to federalism, and I'll touch on this briefly because there's been a lot of discussion about this, I don't think the federalism argument works either. First of all, Justice Kennedy was very clear to say that he wasn't reaching the federalism issue in DOMA. He said it in his opinion explicitly. He then went on three more times to say that any kind of state restriction on marriage has to respect the 14th Amendment. He went out of his way to keep repeating that. Even Justice Scalia in his dissent states that the majority in Justice Kennedy formally disclaimed reliance upon principles of federalism. If you're not relying on that, then you have to go back to general principles of federalism. Let me put it this way. The 14th Amendment came after the 10th. Federalism, while it's certainly a strong body of law, the one thing that is clear about federalism is that the states still have to respect the 14th Amendment. Again, there are legions of cases in this circuit that say that. With respect to the democratic process, again, the arguments are very similar. Obviously, for the 14th Amendment, the idea is to make sure that citizens who are members of minority groups don't have to wait for some democratic majority to protect their constitutional rights. Justice Jackson said this quite eloquently in the West Virginia Board of Education v. Barnett case. While the state surely has the ability to regulate things like marriage or age of consent or consanguinity, the question here is whether the state can exclude from marriage an entire class of citizens. Citizens whose relationships are entitled to constitutional protection based solely on who they are. I want to go back, if I may, to the rational basis question. Another case that's often cited in this regard is Murgia. I don't know if I'm pronouncing it correctly. That was a case about whether it's okay to require police officers to retire at 51, I think, rather than 54. And there the court held, again, on similar issues that we've been talking about, that there was a rough correlation in physical fitness between people who are 54 and people who are 51, so therefore it was okay. That's not the situation here. Here we're talking about excluding a complete class of citizens from all the benefits of marriage. And here the analysis that's being made here would be like saying that in Murgia that you were going to require police officers who were 51 who were left-handed to retire and not people who were right-handed. It's that kind of irrational distinction, that kind of disconnect, that's at issue here. Moreover, and I don't need to belabor this, you can read, I'm sure you have, right, Judge Reeves' opinion for yourself. Unlike in the Sixth Circuit, I'm not from Mississippi, but Judge Reeves below certainly was, and he was not as optimistic as Judge Sutton in the Sixth that the democratic process in Mississippi could be relied upon to give gay people their rights under the 14th Amendment. You can read that yourselves. He's much more of an expert on that than I am. Well, we got an amicus brief from members of the Mississippi legislature, didn't we, in this case? We did. It didn't predict, if I recall correctly, that they intended to pass equal rights for gay people anytime soon. That's my recollection. What do you do with the fact that in Windsor Justice Kennedy referred approvingly to what he called, quote, the usual tradition of recognizing and accepting state definitions of marriage? I think he did say that, and I think he was talking about the fact that it's always okay for states to extend rights to different classes of people. That's what New York did in 2011, and that's what he was talking about with approval. But again, he said three times that states still, in doing so, still have to respect the 14th Amendment. And so the question in this case is whether Mississippi's laws are respecting the 14th Amendment, and I think it's pretty clear that they do not. Let me turn to heightened scrutiny briefly. First of all, I want to correct something that my brother from Louisiana had to say. Under the heightened scrutiny test, in terms of looking at whether a group can contribute to society, you do not look at whether members of that group can contribute to society in connection with the rationales being offered for the statute. So you don't say, okay, here the rationale being offered is gay people don't get pregnant by mistake, which is surely true, and that somehow affects their ability to contribute to society. In Claiborne, what the court says is you have to look at the disability overall. What the court said is your ability to cope with and function in the everyday world. Here, there is absolutely no dispute. No one has disputed that in connection with gay people's ability to cope with and function in the everyday world, gay people are the same as straight people. You have colleagues on the federal bench who are gay. I don't think anyone would dispute their ability to decide cases is just the same as anyone else. Moreover, I would suggest, and this is obviously your Honor's decision, that this court is not bound by Johnson v. Johnson in not deciding the issue. This court has never conducted the analysis under the four-part test. Johnson v. Johnson is a case about a gay prisoner who allegedly was put in a section of the prison deliberately by the warden so that he was raped over and over and over again. The court in that case said if those facts were true, then that action would not even satisfy rational basis. It did not reach heightened scrutiny. It said this court hadn't held there to be heightened scrutiny, but that statement about heightened scrutiny was dictum in the case, as this court has said in the cases we cite about when there is dictum. Moreover— I don't know how you can say it's dictum when the court applied the rational basis test. They didn't just say assuming rational basis applies or something like that, but it directly applied that. I realize when you have—all lawyers do this. When you have precedent that isn't so helpful to your case, you try to figure out a way to say that it's dictum, but I really think that's a stretch here. I'll tell you why I think it is, Your Honor, because just as there's a rule of judicial construction that, as in Windsor, we talked about this, the court only decided the DOMA question in Windsor. It didn't decide the broader question of whether gay people have the right to marry in 50 states. The same standard applies in the heightened scrutiny standard. If the court can decide a case on rational basis without having to go the next step and say that this class of people gets heightened scrutiny or intermediate scrutiny from then on, that's how they do it. That's what the court did in Johnson. That's what the court did in Romer. Clearly what the court did in Romer. And that's why neither you nor the Supreme Court are bound by any holding that gay people don't get heightened scrutiny. Dennis Jacobs in the Second Circuit—there are many ways to decide this case, all of which we win— but Dennis Jacobs did a wonderful job applying heightened scrutiny, applying the factors, and explaining, again, undisputed, that all the factors apply to gay people and that if this law is subject to that standard, it fails. The state of Mississippi doesn't argue otherwise. Now, I'm going to go very quickly to Baker. I agree that the standard—you have this exception about subsequent doctrinal developments. It clearly doesn't mean overruling. If it meant overruling, then it wouldn't say subsequent doctrinal developments. With respect to gay people, for the reasons we've already discussed, there has been a sea change. And I think the important question about Windsor as it relates to Baker is that even the dissents which talk about the implications of Windsor for this greater right to marry in all 50 states, even they don't mention Baker. Neither Justice Roberts, Chief Justice Roberts, nor Justice Scalia, nor Judge Alito, none of them mentioned Baker. If they thought it was a serious argument— It was a different question entirely. The Court didn't reach the question that was covered in Baker, which as you know— I mean, I'm quoting Minnesota Supreme Court— the question is whether state authorization of same-sex marriage is constitutionally compelled. That's what we're here for today. All I would say to that, Your Honor, is that most of Justice Scalia's dissent does talk about that question, and even when he's talking about that question, he's not bringing up Baker v. Nelson. Thank you, Your Honor. Thank you, Ms. Kaplan. Mr. Matheny, you've saved time for rebuttal. Yes, Your Honor. To the point about Windsor, and I think if I'm hearing this correctly, the argument is not that Windsor controls this case, but in looking at the majority opinion and the dissenting opinions, Justice Scalia's opinion and the others, that it's not so much that it controls, but what does it stand for? Is it decided on federalism? Is it decided on some other grounds? I think the point to take from that is that Windsor and other cases may show that there's a trajectory, that the law is moving in a certain direction, but it's not there yet. And the important point is, and this relates to— It is hard to deny the trajectory, though, isn't it? Yes, absolutely, Your Honor. The trajectory is— One point was more unanimous. Now it's a little bit more mixed than it was three or four months ago, but it is moving in one discernible direction. It's undeniable, to use words that I've said before and have quoted back to me, it's undeniable that the trajectory is moving in the direction, and like was mentioned earlier, we may find more about that trajectory. It's a big step to move from saying that it is constitutional criminalized sodomy, which this Court said and the Supreme Court said, and then that was reversed in this same time period. So you go from a status of law where it is criminal to engage in sex, it's very difficult to think in terms of, well, but it's a constitutional right to marry. It's not fair. I'm sorry. That was a friendly question. Just say yes. Yes. Or friendly. Well, I thought that that's what I understood, Your Honor, that it does go exactly to my point is that we may see trends here. That's a trend? The law is moving there, but it's not there yet. So when we're talking about things like Baker v. Nelson, when we're talking about the Johnson case and the process analysis, when you look at the law as it is now and you apply the law now, whether it's rational basis review, which is looking for is there any plausible reason for the law, I mean the procreation rationale for the law is the reason for the marriage law in the first place. It hasn't gone away. The question is, is there a reason to change because the state is not responding? That doesn't negate the procreation rationale. It's still there, but the question is, is it still the best way and it's no longer the only way to address it? Well, no, it's not, but that doesn't undo it when the question is rational basis. It's still a rational basis. It's just not maybe particularly in the eyes of some in that policy choice arena. It may not be the best, but that doesn't mean that there's not one. The point about the caution arguments and the go slow, and I think counsel said that it's counterfactual and that there's not been any testing done, and Your Honor did observe that there was legislators submitted a brief that's supporting the state's position on this. I think that it's important to point out that when you're attacking or when you're condemning that argument and you're saying that essentially I think the way that it was put was that there shouldn't be a vote on constitutional rights is the way that it's put most often. Well, if you look at the law and you apply the law in the 14th Amendment, we're talking about a social policy issue, not a constitutional right issue yet, and that's what makes it okay and that's what makes it important for the states to be able to decide for themselves on a policy issue like this. Saying that Mississippi will never change its mind or it's not likely to is not a reason to take away the state's ability to decide things. A few years ago, there was a personhood amendment that came up that was put on the ballot, and everybody thought that it was going to pass. Lots of people disagreed with it. People sued over it, and the Supreme Court found that there was no standing to be able to challenge the law before the vote, but the vote came out, and in the eyes of some, the people made the right decision. In the eyes of others, they didn't. Those words, will Mississippi change its mind, have resonated in these halls before. Your Honor, if I may conclude, the state asks that the court reverse the district court's preliminary injunction below. Thank you, Mr. Matheny. I think at the beginning I neglected to call the style of this case Campaign for Southern Equality v. Bryant, and that case, which is the Mississippi case, is now under submission. The court will take a recess before hearing the Texas case.